Merle MUTHLER, Plaintiff,

v.

ANN ARBOR MACHINE, INC.
et al., Defendants.

No. 97–70711.

United States District Court,
E.D. Michigan,
Southern Division.

July 31, 1998.

Lawrence J. Leib, Southfield, MI, for Plaintiff.

Robert A. Boonin, Ann Arbor, MI, for Defendants.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

On February 24, 1997, Plaintiff Merle Muthler filed this wrongful termination claim against Defendants Robert Betzig, James Briening, and Ann Arbor Machine, Inc. alleging discrimination in violation of the Americans with Disabilities Act ("ADA") because of a heart condition which limited his ability to work long hours. Muthler also alleges Defendants breached his employment contract by terminating him without just cause. On June 1, 1998, Defendants filed the motion for summary judgment now before the Court, to which Plaintiff responded on July 28, 1998, just two days before the hearing on this matter.[1]

### II. FACTS

Plaintiff Merle Muthler was co-owner, along with William Ryzi, of Ace Broach & Machine, Inc. ("Ace"), a corporation whose expertise was building, fabrication and installation of broach machines. In April of 1994, Defendant Ann Arbor Machine, Inc. ("Ann Arbor Machine"), purchased the assets of Ace for $12,000, the terms of which where memorialized in an asset purchase agreement. (Defendants' Ex. 2).[2] At the time of the sale, Defendants hired Plaintiff as its Broach Machine Assembly Manager of the plant in Warren, Michigan. Plaintiff's duties were to oversee the actual assembly and construction operations of the broach machines. While the asset purchase agreement makes no mention of Plaintiff's employment with Ann Arbor Machine, Plaintiff claims that the employment of himself and Mr. Ryzi in "positions of authority" with "substantial salaries" was part of the package negotiated by the parties. (Plaintiff's Brief, p. 3).

Plaintiff testified that when he began working at Ann Arbor Machine, he worked approximately 70–84 hours per week in order to complete the broach machine work in process. In March of 1995, Plaintiff suffered a heart attack at his home. As a result of the attack, Plaintiff was forced to take a three-month paid leave of absence. When Plaintiff returned to work, the jobs on which he had been working were completed and the Warren plant was closed. All broach division operations were relocated to Chelsea, Michigan, where Plaintiff began working. Upon his return to work, Plaintiff's physicians placed him under a medical restriction, requiring that he work no more than 32 hours

---

1. Although the response was clearly untimely, the Court considered the brief in the interests of justice, as it is entitled to do under Rule 6(b) of the Federal Rules of Civil Procedure. As the Court noted at the hearing, Defendants were not prejudiced by the untimely filing because Plaintiff's brief did not raise any new or novel issues.

2. The $12,000 was consideration for an itemized list of goods, including furniture, machinery, office equipment, tools and other such items. The amount was to be increased by an amount to be determined by mutual agreement of the parties for inventory and work in-process.

per week. (Defendant's Ex. 4). Plaintiff worked 32 hours a week for one month, after which time his restrictions were modified allowing him to work 40 hours per week. After Plaintiff began working 40 hours a week, his supervisors, Defendants' Betzig and Briening, inquired every four to six weeks when his restrictions would be lifted, allegedly unhappy about Plaintiff's inability to work overtime. (Plaintiff's deposition, p. 70). Plaintiff's cardiologist, however, refused to raise or eliminate the restriction.

In March of 1996, Plaintiff was laid-off and later terminated. Defendants' stated reason for the termination was the lack of orders to be filled. Plaintiff alleges that this statement is false, and that there was substantial work which needed to be finished, as well as new orders from Chrysler Corporation. Subsequently, Plaintiff filed a charge with the Equal Employment Opportunity Commission contending that his termination was in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.* On November 25, 1996, the EEOC issued a "right to sue" letter and Plaintiff filed this suit. In his statement to the EEOC, Plaintiff stated he was the only employee laid off. As of this date, Plaintiff's former position has not been filled.

### III. ISSUES PRESENTED

Plaintiff's complaint consists of two counts. In the first count, Plaintiff alleges that Defendants violated the Americans with Disabilities Act ("ADA") by wrongfully terminating him for his inability to work overtime and by refusing to reasonably accommodate his inability to work more than 40 hours a week pursuant to his physician's medical restrictions. In his second count, Plaintiff contends that Defendants breached a "just-cause" employment contract by terminating him without just cause.

Defendants argue that Plaintiff was not "disabled" within the meaning of the ADA, and that Plaintiff was actually an "at-will" employee that they had a right to terminate without cause.

**3.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."

### IV. STANDARD OF REVIEW

Summary judgement is proper "if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[3] According to the *Celotex Court:*

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

> *Cases involving state of mind issues are not necessarily inappropriate for summary judgement.

> *The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice & Procedure, § 2727, at 35 (1996 Supp.).

*The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

*The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

*The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[W]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.* 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce,* 35 F.3d 247, 249 (6th Cir.1994).

## V. ANALYSIS

### A. Breach of Contract Claim

■ In his complaint, Plaintiff alleges that he entered into an agreement with Defendants whereby he was "entitled to be classified as an employee who could only be terminated for cause," and that Defendants breached that agreement by terminating him without cause. (Plaintiff's complaint p. 4). Plaintiff asserts that being classified as a "just cause" employee was part of the consideration for the sale of Ace. Plaintiff states he and his partner, William Ryzi, were given $12,000 cash and guaranteed "positions of authority ... at substantial salaries." (Plaintiff's brief, p. 3). Plaintiff further argues that to classify his employment as "at will" would mean that he and Mr. Ryzi sold the company for only $12,000, a sum alleged to be less than the company's worth. Although Plaintiff may well have had a subjective belief that his employment was "just cause," the evidence overwhelmingly indicates that Plaintiff was actually an "at-will" employee.

■ Under Michigan law, "either party to an at-will employment contract for an indefinite term may terminate it at any time and for any reason...." *Sepanske v. Bendix Corporation,* 147 Mich.App. 819, 826, 384 N.W.2d 54, 58 (1985). Indeed, under Michigan law, employment relationships are presumed to be "at will" in the absence of a specific contractual provision to the contrary. *Valentine v. General American Credit, Inc.,* 420 Mich. 256, 258–59, 362 N.W.2d 628 (1984). Thus, unless Plaintiff comes forward with record evidence establishing that he had a legitimate expectation that he could only be terminated for just cause, Plaintiff's employment relationship is "at will" and he can be terminated without proof of cause.

Here, the evidence actually proves to the contrary. Indeed, the most persuasive evidence that Plaintiff was classified as an "at-will" employee is his own testimony. During his deposition, Plaintiff stated:

(Mr. Leib): What was your understanding of the nature of your employment, at-will or just cause?

\* \* \* \* \* \*

(Plaintiff): My understanding was very clear based on the, one of the final meetings where we were signing documents that specifically we were told that we were, after negotiating the sale and the salaries, we were then told that *we were at-will employees. So we, in fact, were told that we were at-will employees.*

(Mr. Lieb): This was after the sale?

(Plaintiff): The documents were not signed, but we were at the meeting where they were signed.

(Plaintiff's dep., p. 143) (emphasis added). In addition to admitting in his deposition that he was an at-will employee, Plaintiff also signed an application for employment which contained a provision stating that "either party may terminate the employment relationship, with or without cause, at any time for any reason." (Defendants' Ex. 3; Employment Application, p. 2).[4]

■ Notwithstanding this evidence, Plaintiff has insisted that he understood that his

---

4. Plaintiff claims he was told that the form was a formality. (Plaintiff's brief, p. 5).

just cause employment was part of the deal to sell Ace to Defendants. However, there is nothing in the sales agreement to support Plaintiff's contention that his long-term employment was consideration for the sale of the company, and the Court will not infer that such a clause exists. Under Michigan law, "It is a basic rule of construction that a court cannot change the terms of an agreement. Nor can it supply material provisions absent from a clear and unambiguous writing." *Hy King Associates, Inc. v. Versatech Manufacturing Industries*, 826 F.Supp. 231, 239(E.D.Mich.1993) (*quoting Purlo v. 3925 Woodward Ave.*, 341 Mich. 483, 67 N.W.2d 684 (1954); *Giffels & Vallet v. Edward C. Levy Co.*, 337 Mich. 177, 58 N.W.2d 899 (1953)). The agreement does not in any way refer to Plaintiff's prospective employment, or the length of that employment. (Defendant's Exhibit 2). The only consideration on the face of the agreement is the $12,000 given in exchange for the list of assets enumerated in an exhibit to the agreement, along with the promise that the parties would mutually agree to an allowance for raw inventory and partially completed work. Plaintiff has not presented any evidence that this amount is so grossly inadequate that it must read a "just cause" employment provision into the contract in order to ensure that sufficient consideration exists. The Court cannot not, and will not, supply additional terms to this unambiguous contract.

 Plaintiff also contends that he was a "just cause" employee based Mr. Betzig's representations that Plaintiff's employment would be long term. Under Michigan law, "oral statements of job security must be clear and unequivocal to overcome the presumption of employment at will." *Rowe v. Montgomery Ward & Co.*, 437 Mich. 627, 645, 473 N.W.2d 268 (1991). The alleged statements regarding job security made to Plaintiff in this case took place at a meeting with Plaintiff and Defendant Betzig. Plaintiff

himself characterized this conversation as follows: "While Mr. Betzig made no guarantees regarding length of employment, Plaintiff was encouraged by Mr. Betzig's commitment to him." (Plaintiff's brief, p. 4).

Even accepting Plaintiff's rendition of this conversation, it cannot be characterized as a "clear and unequivocal" statement which is capable of modifying the at-will relationship created by Plaintiff's employment application. Plaintiff concedes that Betzig made no guarantees of continued employment. While Plaintiff was encouraged by his conversation with Betzig and may have believed that his employment would be long term, his subjective expectation does not create an enforceable contract right. *Sepanske v. Bendix Corp.*, 147 Mich.App. 819, 827, 384 N.W.2d 54 (1985) ("The plaintiff may have a subjective expectation that he would be terminated only for just cause. However, 'plaintiff's subjective expectation does not create an enforceable contract right'.") (*citing Schwartz v. Michigan Sugar Co.*, 106 Mich.App. 471, 308 N.W.2d 459 (1981)). Plaintiff has not come forward with any evidence, other than his subjective belief, to show that he had a legitimate expectation that he could only be terminated for cause.

Therefore, because Plaintiff stated in his deposition that he knew the employment was to be at-will, signed an application to that effect, and has produced no evidence to the contrary to support his claim, the only possible conclusion is that Plaintiff was an at-will employee. As the employment relationship between Plaintiff and Defendant did not include a "just cause" component, Defendants need not proffer an explanation for Plaintiff's termination under the terms of the employment agreement. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's breach of contract claim is hereby GRANTED.[5]

---

5. Additionally, Plaintiff concedes that he may not assert a breach of contract claim against Defendants Betzig and Briening as individuals. (Plaintiff's brief, p. 2). Recently, the Sixth Circuit stated that "a known agent is bound by the contracts of his or her principal only when the 'circumstances show that the agent intended to be bound or assumed the obligations under the

contract.'" *Menuskin v. Williams*, 145 F.3d 755 (6th Cir.1998) (*quoting Holt v. American Progressive Life Ins. Co.*, 731 S.W.2d 923, 925 (Tenn.Ct. App.1987)). There is nothing in the record, nor has Plaintiff brought forward any evidence, suggesting that Defendants Betzig and Briening intended to be held individually liable on the employment contract.

### B. Handicap Discrimination Claim under the ADA

#### 1. Substantial limitation of major life activities

■ Plaintiff alleges that Defendants violated the ADA by wrongfully failing to accommodate him and terminating him for his inability to work overtime. In order to establish a prima facie case under the ADA, Plaintiff must show that (1) he suffers from a disability as defined by the ADA; (2) he is qualified to perform all of the essential functions of his job with or without accommodation; and (3) he was discharged because of that disability. *See Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1179 (6th Cir.1996). An employer can also violate the Act if it does not make "reasonable accommodations" to the known physical or mental limitations of an otherwise qualified individual with a disability. 42 U.S.C. § 12112(b)(5)(A).

■ The threshold issue is whether Plaintiff was "disabled" within meaning of the ADA. The term "disability" is defined under the ADA to include, *inter alia*, "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C.A. § 12102(2). Guidance as to the meaning of "substantially limiting one or more major life activities" can be found in the Code of Federal Regulations, which provides:

(2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

(3) With respect to the major life activity of working—

(i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as com-

pared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

(ii) In addition to the factors listed in paragraph (j)(2) of this section, the following factors may be considered in determining whether an individual is substantially limited in the major life activity of "working":

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 CFR § 1630.2. *See also, Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 n. 12 (7th Cir.1995).

As noted in the regulations, the impairment must limit employment generally, *Byrne v. Board of Ed., Sch. Of West Allis– West Milwaukee*, 979 F.2d 560, 565 (7th Cir. 1992), and "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). *See also, Roth*, 57 F.3d at 1454–55 (the inability to perform either a particular job for a particular employer or a narrow range of jobs is not a disability); *Overton v.. Tar Heel Farm Credit*, 942 F.Supp. 1066 (E.D.N.C.1996) ("the Fourth Circuit has repeatedly held that, as a matter of law, an employee cannot be deemed to have a substantially limiting impairment where he can show only that the limitation affects his ability to perform a

particular job, but does not significantly restrict his ability to perform either a class of jobs or a broad range of jobs in various classes") (*cites omitted*); *Bolton v. Scrivner, Inc.,* 836 F.Supp. 783, 787–89 (W.D.Okla. 1993) (the plaintiff bears the burden "to demonstrate that he is disabled in some more general sense transcending his specific job"). Quite simply, the definition of major life activity does not mean working at the specific job of one's choice. *Byrne,* 979 F.2d at 565.

Based on the above definition, Plaintiff is not "disabled" as defined under the ADA. Courts have consistently held that an inability to work overtime does not constitute a "substantial limitation on a major life activity." In *Kolpas v. G.D. Searle & Co.,* 959 F.Supp. 525 (N.D.Ill.1997), the plaintiff, who regularly worked 60–70 hours in her position managing an accounts payable department, was told by her doctor that she could only work a normal work-week to avoid stress because of a heart condition. The plaintiff was later terminated by her employer, prompting her to bring an ADA claim for the company's failure to accommodate her need for a schedule with reduced hours. The court held that the allegation was not sufficient to constitute a disability because her "inability to work more than forty-hours per week by itself does not constitute a major life activity of working." *Kolpas,* 959 F.Supp. at 529 (*citing Duff v. Lobdell–Emery Mfg. Co.,* 926 F.Supp. 799, 808 (N.D.Ind.1996)) (finding that an impairment that renders a person incapable of working more than forty hours a week is not a disability under the ADA). The court's ruling was based, in part, on the plaintiff's failure to present any evidence that her capacity to function in the general workforce was substantially limited. *Kolpas,* 959 F.Supp. at 529–30.

A similar ruling obtained in *Shpargel v. Stage & Co.,* 914 F.Supp. 1468 (E.D.Mich. 1996), in which this Court rejected an ADA claim by a plaintiff who was fired for refusing to work overtime because of his carpal tunnel syndrome. The plaintiff claimed that his carpal tunnel syndrome substantially limited his ability to work longer than eight hours per day, although he admitted he could perform various manual tasks for eight hours per day.

The Court held: "This type of impairment does not constitute a significant restriction on plaintiff's ability to perform manual tasks or any other major life activity." *Shpargel,* 914 F.Supp. at 1474. *See also, Doren v. Battle Creek Health System,* 1998 WL 689956, 1998 Lexis 9450, *7 (W.D.Mich.) (nurse who could only work eight hours a day, while other nurses could work twelve, did not suffer from a substantial impairment of a major life activity); *Brown v. Northern Trust Bank,* 1997 WL 543098, *6 (N.D.Ill.) ("Nor does the inability to perform a high stress job with long hours render [the plaintiff] 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes,' the criteria for being substantially limited in the major life activity of working."); *Duff v. Lobdell–Emery Manufacturing Company,* 926 F.Supp. 799 (N.D.Ind.1996) (an inability to work more than the normal 40–hour week, without more, is not a substantial limitation on the major life activity of working); *Brennan v. National Telephone Directory Corporation,* 850 F.Supp. 331 (E.D.Pa.1994) ("Obviously, anyone who can work 40 hours a week as a limitation of their abilities is not suffering a substantial impairment of a major life activity, namely, the ability to work. The inability to work overtime hardly makes a plaintiff handicapped.").

Most recently, a district court in Rhode Island addressed the same issue under both the ADA and the Rehabilitation Act. In *Tardie v. Rehabilitation Hosp. of Rhode Island,* 6 F.Supp.2d 125 (D.R.I.1998), the plaintiff, employed as the director of human resources for a hospital required to work 50–70 hours per week, was told by her doctor that she could not work more than 40 hours a week because of an enlarged heart valve. The hospital informed the plaintiff that she could not return to her previous position because it could she could not discharge her duties as director of human resources in a 40 hour work week. In ruling on the analogous Rehabilitation Act, the court stated:

> Plaintiff argues that she has a physical impairment which substantially limits one or more of her major life activities. Her doctor has said that she cannot work more than forty hours per week without suffer-

ing adverse consequences. While the applicable regulations indicate that working is a major life activity, 29 C.F.R. § 1613.702(c), they also indicate, however, that the "inability to perform a single, particular job does not constitute a substantial limitation on the major life activity of working." 29 C.F.R. § 1630 .2(j)(3)(i). Therefore, a person who is "unsuitable for a particular position has not thereby demonstrated an impairment substantially limiting such person's major life activity of working." *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 724 (2nd Cir.1994), *cert. denied* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

Plaintiff herself has indicated that the Director of Human Resources job is very demanding, requiring one to work between fifty and seventy hours a week. When asked if there were times when she was required to deal with matters beyond the hours of 9 am–5 pm, she said it happened quite frequently since it was part of the job. She also acknowledged that the position often required her to return to work after she had gone home for the evening and that she frequently needed to be present at the hospital for at least a portion of all three eight hour shifts. Additionally, plaintiff herself drafted the job description for the Director's position which states that the Director must have "the ability to maintain assigned work hours and have sufficient endurance to perform tasks over long periods of time ."

*Tardie*, 1998 WL 293153, at 4.

In this case, Plaintiff cannot be considered "disabled" as it is defined under the ADA because his only restriction was that he could not exceed 40 hours of work per week, which does not "substantially limit a major life activity." Even if, as Plaintiff contends, his supervisors terminated him because of his inability to work long hours, he would not be able to survive this motion. Simply because Plaintiff was unsuitable for the assembly manager position, which required long hours, he has not thereby demonstrated an impairment substantially limiting the major life activity of working. *Tardie*, 1998 WL 293153, at

**6.** Plaintiff testified that his termination was an effort by others to run the business without him.

4; *Shpargel*, 914 F.Supp. at 1474; *Kolpas*, 959 F.Supp. at 529. The term substantially limits means that the employee is significantly restricted in his ability to perform either a class of jobs or a broad range of jobs in various classes, not that he unable to perform one specific job. Therefore, because Plaintiff is not covered under the provisions of the ADA, summary judgment for Defendants is proper on this issue.

### 2. *Legitimate business reasons for termination*

■ As the Court has already determined that Plaintiff was not "disabled," he has failed to establish a prima facie case under the ADA. However, even assuming arguendo Plaintiff was able to establish he was disabled under the ADA definition, his claim fails because he has not proven Defendants' reason for termination was pretextual. It is well-settled that under the ADA, once the plaintiff establishes a prima facie case of discrimination, the burden of persuasion shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1185 (6th Cir.1996). If the employer offers a legitimate reason for its action that is unrelated to the employee's disability, "the plaintiff will bear the burden of establishing that the proffered reason is a pretext for unlawful discrimination." *Id.* at 1186.

Defendants stated in their brief that the reason for Plaintiff's termination was a decrease in orders for new broach machines. An affidavit from Defendant's Chief Financial Officer, Randall Biddix, states:

> The decision to layoff Mr. Muthler was due to the lack of orders for broach machines, and the lack of work for the division. In May of 1996, Ann Arbor Machine determined that it no longer needed an assembly manager, and therefore Mr. Muthler's position was eliminated.

(Defendant's Ex. 5). In addition, when Plaintiff was asked in his deposition why he believed he was terminated, Plaintiff made no mention of his heart condition.[6]

(Plaintiff's dep., p. 145).

Plaintiff has not produced any record evidence that this stated reason was pretextual, although his brief states various theories that could, if supported, create a genuine issue of material fact. Plaintiff insists that there was substantial work at the time of his termination. Plaintiff's brief states: "While the Plaintiff admitted that prior to March of 1996, Ann Arbor Machine had not shipped a new machine in over a month and he believed that existing jobs were 80 to 85 percent complete, there was substantial work which need to be finished. The testing and installation phases of a project due to the complexity of each machine can take weeks or months to complete." (Plaintiff's brief, p. 6). Plaintiff also alleged that, since his deposition, he was informed by a contact in the broaching industry that Chrysler Corporation ordered new products from Defendant at the time Plaintiff was terminated. However, Plaintiff has not presented any evidence, in the form of documentation, affidavit, deposition, or otherwise to substantiate these claims. Therefore, he has failed to rebut the legitimate business reasons for his termination set forth by Defendants.

 Therefore, because Plaintiff has failed to raise an issue of fact as to whether Defendants' stated reason for termination was pretextual, Summary Judgment is DENIED.[7]

## VI. *CONCLUSION*

Therefore, Defendants' Motion For Summary Judgment is hereby GRANTED.

---

7. Plaintiff concedes that Defendants Betzig and Briening may not be held individually liable under ADA. (Plaintiff's brief, p. 2) The definition of "employer" under the ADA is analogous to Title VII's definition of "employer," and the terms should be interpreted similarly. Both statutes define "employer" as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calender weeks ... and any agent of such person." 42 U.S.C.A. § 12111, § 2000e(b) of Title VII.

The Sixth Circuit recently held that an "employee/supervisor who does not otherwise qualify as an 'employer' cannot be held individually liable under Title VII and similar statutory schemes." *Wathen v. General Electric Company*, 115 F.3d 400, 404 (6th Cir.1997). The court stated, "the statutory scheme itself indicates that Congress did not intend to impose individual liability on employees." Title VII limits liability to employers with fifteen or more employees, 42 U.S.C. § 2000e(b), "in part because Congress did not want to burden small entities with the costs associated with litigating discrimination claims." As the definitions of employer are identical in the two statutes, the Court finds *Wathen* controlling and holds supervisors cannot be held individually liable under the ADA.

---

THE CASE IS DISMISSED WITH PREJUDICE.